THE PRESIDENT OF THE UNION BRIDGE COMPANY, Appellant, *v.* THE TROY AND LANSINGBURGH RAILROAD COMPANY, Respondent.

(GENERAL TERM, THIRD DEPARTMENT, NOVEMBER, 1872.)

If a committee of three directors has discretionary power for the execution and delivery of a lease of the corporate property, two of the members may seal it with the corporate seal, where the third is absent, but has approved its terms and concurred with the others in directing its engrossment for execution. *So held*, one of the members executing being president of the corporation and custodian of its seal.

And the signature of the two members and sealing by them is sufficient execution.

And, it seems, the corporate seal being properly affixed, no signature was necessary to the valid execution of the corporate lease.

President of the Union Bridge Co. *v.* Troy and Lansingburgh R. R. Co.

Where the resolution appointing the committee provided for a lease for a certain term of years, and the lease, as executed, was for an indefinite time, *held*, that the company afterward ratified the lease, as executed, by suffering the lessee to act upon it to its damage, by the receipt of rent and other acts recognizing its existence.

A contract made by a corporation in violation of the terms of its charte is *ultra vires*, and void as against public policy.

Corporations may invoke the aid of the court to relieve them from their illegal contracts in like manner as individuals.

In general, where parties contracting illegally are *in pari delicto*, courts of equity will not interfere to grant relief to either. But where the agreement is against public policy, the fact that the relief is asked by a party who is *particeps criminis* is not, in equity, material, because the public interest requires that relief should be given, and it is given, to the public through the party.

Accordingly *held*, that a contract, *e. g.*, a lease made by a railroad company for the purpose of extending its road beyond the *terminus* fixed by its charter, was *ultra vires*, and void as against public policy, and should be set aside by the courts on the application of one of the parties.

But, *held*, the court would not relieve the parties further than the public interest required, and, therefore, that no recovery could be permitted for the use of the property leased, previous to its being declared invalid.

*L. Tremain,* for the plaintiff.

*E. Cowen,* for the defendant.

Present—MILLER, POTTER and PARKER, JJ.

PARKER, J.  This action was brought to obtain a judgment, declaring a certain writing purporting to be an agreement, or lease between the parties, void, and perpetually enjoining the defendants from crossing the bridge of the plaintiffs on the rails laid by defendants, and to recover the amount which plaintiffs allege defendants have become liable to pay on account of the crossing of said bridge for some time prior to the commencement of the suit.

The action was tried at the Saratoga circuit before a justice of this court and a jury. The jury was discharged, with the consent of the parties, at the close of the evidence, and the case reserved for the consideration of the justice, who

subsequently rendered his decision dismissing the complaint upon the merits, with costs to defendants. From the judgment entered upon the dismissal of the complaint the plaintiffs appeal.

It appears from the findings of the justice that the plaintiffs are a bridge company duly incorporated under the laws of this State, and as such owned and maintained a toll bridge over the Hudson river between the village of Waterford, in the county of Saratoga, and the village of Lansingburgh, in the county of Rensselaer; that the defendants are a railroad corporation, duly organized for the purpose of constructing and operating a railroad, as declared in its articles of association, "from some point in the village of Lansingburgh to some point in the city of Troy, hereafter to be fixed and located," and its articles further declare "that the said road will be constructed entirely within the county of Rensselaer;" that on the thirty-first day of May, 1862, the plaintiffs' directors, at a meeting of their body duly called, adopted a resolution appointing Isaac McConihe, Charles S. Douglass and William B. Douglass a committee with power to enter into and complete and execute a contract with defendants, if they should think it for the interests of the plaintiffs, granting to the defendants the privilege of crossing the bridge of the plaintiffs with horse power for a term of years, to be agreed upon by the defendants and said committee, and for such compensation and on such conditions as such parties might agree upon; that all the members of the committee named in said resolution met a committee of three persons duly appointed and empowered on the part of the defendants, and said committee at said meeting deliberated and negotiated upon the subject-matter of such resolution; that at the time of such deliberation and negotiation, and upon consultation with all the members of each committee, and with the approval of Charles S. Douglass and William B. Douglass, his associates upon the committee so appointed by the plaintiffs, the said McConihe reduced to writing the terms of a contract between the parties then agreed upon, which writing was

submitted to and approved by each and all of the members of said committees; that in consequence of interlineations in said writing it was agreed between said committees that he (the said McConihe) should make duplicate copies thereof, which should be executed by said committees; that within a short time thereafter the said McConihe did prepare duplicate copies of said writing in the same form in which it had been so adopted by said committees, which were executed and delivered by the said committee on behalf of the defendants under their hands and the corporate seal of the defendants, and the same were executed and delivered by the said Isaac McConihe and Charles S. Douglass under their hands and the corporate seal of the plaintiffs, but the same were never signed by the said William B. Douglass for the reason that he was the resident of a foreign county and was obliged to return to his residence before said copies were prepared; that afterward, in the year 1862, the defendants constructed their track across the bridge of the plaintiffs, under and in pursuance of said written agreement; that before said work was done the plaintiffs furnished to their superintendent a copy of said written agreement and instructed him to superintend the work for the purpose of seeing that the same was performed in obedience to the requirements of said written agreement, and said superintendent complied with such instructions; that from the date of said written agreement, and according to its terms, the defendants paid to the plaintiffs the rent or toll reserved thereby up to July, 1868, and the plaintiffs received the same, under and by virtue of said written agreement, with knowledge, by their directors, of the manner in which said contracts were executed, and the defendants performed the same on their part; also, that on the 1st day of June, 1864, the plaintiffs, at a meeting of the board of directors, adopted and entered on their book of minutes a preamble and resolution, reciting that by the contract between these parties the defendants were restricted to the passage of their cars across the plaintiff's bridge upon a walk of the horses, and com-

plaining that defendants had permitted their cars to be driven across faster than a walk, to the injury of the bridge, and directing their president to seek the enforcing of the terms of the contract in that respect; that the contract, so referred to, was the same contract so executed as aforesaid; that the defendants, in reliance on said agreement, have expended large sums of money in constructing their track across said bridge, and in furnishing additional horses and equipments for its operation; that until about June, 1868, plaintiffs did not, in any mode, dissent from said agreement, or intimate that it was invalid for imperfect execution, or for any other cause; and defendants acted under the same in good faith; that in June, 1868, plaintiffs repudiated said agreement upon the ground that it was not, on their part, properly executed, and served upon defendants a notice to quit, and from that time have refused to receive the rent or toll reserved by said agreement.

As matter of law the justice concluded that the plaintiffs are not entitled to the relief demanded in the complaint, or any part thereof, and that the defendants are entitled to a judgment dismissing the complaint on the merits, with costs.

The plaintiffs insist, in the first place, that the agreement is void for the reason that it was signed by but two out of the three members of the committee on the part of the bridge company.

As the agreement was executed by two of the three committeemen by signing their names and impressing upon it the corporate seal, it being found that the third member of the committee concurred in the agreement as it was written, and in the undertaking that the duplicate copies to be made should be executed, I think it may well be held that the execution thus made was sufficient to bind the company.

Under such circumstances it cannot be said that the corporate seal was not properly affixed to the instrument. And if it was properly so affixed it was a sufficient execution, without the signature of either member of the committee. (3 John., 226; 3 Bos. & Pul., 306; 15 Wend., 258.)

" The seal of a corporation aggregate, affixed to a deed, is of itself *prima facie* evidence that it was affixed by the authority of the corporation, especially if proved to have been put to the deed by an officer who was intrusted by the corporation with the custody of such seal." (*Lovett* v. *Steam Saw-mill Ass'n*, 6 Paige, 54, 56.) In that case the seal was affixed by the president of the company, and COWEN, vice-chancellor, said in the same case, p. 56: " Proof that the common seal was affixed, by no matter whom, is enough, *a fortiori*, when it is affixed by the head officer of the corporation."

In the case at bar, it sufficiently appears that the seal was affixed by the two members of the committee who signed the agreement, of whom one, McConihe, was president of the company, and had the custody of the seal. Although W. B. Douglass did not remain to sign the duplicate copies which he concurred in ordering to be made for execution, he concurred in the contract, and consented to the affixing of the seal. The committee performed the duty with which they were charged, when they completed the contract and directed the execution of the duplicates to be copied from the original drafts, in which they had concurred. It was not necessary to its execution that they should each sign it. It is said in Angel & Ames on Corp., § 221: " But though by charter a certain number of a board are required to concur in entering into a special contract, or making a deed, it does not follow that the affixing of the seal, which is merely a ministerial act, may not be done by a less number than were at first competent to enter into the contract, provided it were done by the direction of a legal quorum."

This view precludes the necessity of examining the question of ratification, except so far as it affects the allegation that the committee exceeded the powers conferred upon them by the resolution, in not limiting the time of the right given to defendants to cross the bridge, to a term of years. As to this ground for declaring the contract void, it is a sufficient answer to say that the board of directors subsequently ratified the agreement made, so far as this objection is concerned, by

suffering defendants to lay down their track across the bridge under the contract, taking the yearly compensation for six years, and by formally resolving to compel defendants to conform to the contract in the matter of driving across upon a walk. It is too late, after all this, for them to say that their committee exceeded their powers in conferring upon defendants the right to cross during the continuance of plaintiffs' charter. There can be no pretence that the board was, when all these acts were done, unacquainted with the terms of the agreement. They had it in their possession, and acted in reference to it and its specific provisions.

But again: it is urged by the plaintiffs that the contract is, particularly as to the defendants, *ultra vires,* in that it provides for the extending of their railroad beyond the limits specified in their articles of association, and hence, necessarily, *unlawful* and void.

The Troy and Lansingburgh Railroad Company was, by the terms of its articles of association, organized "for the purpose of constructing, maintaining and operating a railroad for public use, in the conveyance of passengers and property from some point in the village of Lansingburgh to some point in the city of Troy, to be located." And it is thereby further specified, that "the said road will be constructed entirely within the county of Rensselaer."

It is plain that the agreement in question was made for the purpose of enabling defendants to extend and operate their railroad, for public use, beyond the *terminus* which they had fixed, or were authorized, under their charter, to fix, in the village of Lansingburgh, and in the county of Rensselaer, across the Hudson river, into the village of Waterford, in the county of Saratoga.

They had no right to build and operate their railroad, for such purpose, beyond the limits fixed by their charter; and the agreement, by virtue of which they did so, was very clearly *ultra vires.*

As was said by SELDEN, J., in *Bissell* v. *The M. Southern and N. Indiana R. R. Companies* (22 N. Y., 285), "The

contracts of corporations which are not authorized by their charters are illegal, because they are made *in contravention of public policy ;*" and, again, "The assumption of any unauthorized power by a corporation is a violation of public policy and public right, and, therefore, illegal." (Id., p. 289.) If the agreement is illegal, as being against public policy, both parties must be deemed to have been cognizant of that fact when it was entered into. Defendants' powers, in regard to the right to cross the river with their railroad, are set forth in their articles of association, filed in the office of the Secretary of State. These articles, constituting defendant's charter, must be deemed known to plaintiffs, equally as though such charter was given by statute.

The same rule applies to corporations in regard to the right to invoke the aid of the court to relieve from illegal contracts as to individuals. Says SELDEN, J., in the case last cited (p. 304): "If it be said that, in the case of illegal contracts between individuals, each party is a participator in the guilt, and, hence, the law will not interfere to protect either; this is equally true in respect to the unauthorized contracts of corporations. Their powers are prescribed by statute ; and every one who deals with them is presumed to know the extent of their powers."

The parties are, in respect to this illegal contract, clearly *in pari delictu ;* and the well known maxim, in such cases, is *potior est conditio possidentis, et defendentis.*

Will the court, then, listen to either party seeking relief from the contract ?

In general, when parties are concerned in illegal agreements, courts of equity, acting upon the above maxim, will not interfere to grant relief to either. But in cases where the agreements are against public policy, the circumstance that the relief is asked by a party who is *particeps criminis* is not, in equity, material, because the public interest requires that relief should be given ; and it is given to the public through the party. (1 Story's Eq. Jur., § 298.) In *St. John* v. *St. John* (11 Ves., p. 535) the court say : "The authorities

go to this, that when the transaction is *against policy*, it is no objection that the plaintiff himself was a party in that transaction which is illegal. In *Sherly* v. *Ferries*, in the Court of Exchequer, a few years ago, the case of a marriage procage bond, the plaintiff was a party to the transaction— *particeps criminis;* but the court held that when the relief is upon the policy of the law, that is not material, the public interest requires that the relief should be given; and it is given through that party." (See, also, *Jackson* v. *Mitchell*, 13 Ves., 587.) And in note 4 to the case of *Hatch* v. *Hatch* (9 Ves., 299, Sumner's ed.) it is stated as follows: "In delivering his judgment, in *Gilbert* v. *Chudleigh*, Lord HARDWICKE (as appears from Mr. Forrester's MS.) expressed himself as follows: 'It was urged for the defendant that this is a bill brought by one of the parties to a corrupt agreement against a representative of the other, who is a stranger to it; and that, though an executor might have claim to relief for the sake of providing assets, yet the court will show no favor to either of the parties themselves. But the truth is that, in these cases of violations of public policy, it is indifferent who stands before the court if the intention of the contract be evident; because the court does not regard the state and condition of the parties so much as the nature of the contract and the public good.' The contract thus in question was a security, given as a consideration for procuring the obligor a public office."

If the contract, in the case at bar, was illegal, as we have above held it to be, and if plaintiffs are not precluded from invoking the assistance of the court for relief, as the cases referred to seem to establish, then I think the plaintiffs were entitled to relief against the illegal contract, to the extent of having it decreed void, and the defendants perpetually enjoined from running their cars across plaintiffs' bridge under or by virtue of it.

As to the demand in the complaint, that defendants be adjudged to pay plaintiffs for the use of the bridge, I do not see how that can well be granted. The court gives relief to

the plaintiffs only so far as the public interest requires; it declares the contract void, and prohibits the defendants from further enforcing it, and thereby violating their public duty, but will not proceed further in behalf of the *particeps criminis.*

"Even in cases of a *premium pudicitiæ,*" says Judge STORY, "the distinction has been constantly maintained between bills for restraining the woman from enforcing the security given, and bills for compelling her to give up property already in her possession under the contract. At least, there is no case to be found where the contrary doctrine has been acted upon, except where creditors were concerned." (1 Story's Eq. Jur., § 299.)   See, also, remark of Lord ELDEN, in *Rider* v. *Kidder* (10 Ves., § 66), to the same effect.

I think the court, at Special Term, was wrong in dismissing the complaint, and am of the opinion that a new trial should be granted, with costs to abide the event.

MILLER, P. J., concurs; POTTER, J., not voting.